IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NENAD M. KOSTIĆ, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-cv-02265-M |
| | § | |
| TEXAS A&M UNIVERSITY | § | |
| AT COMMERCE, ET AL. | § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
SECOND (RENEWED) MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE MAGISTRATE JUDGE DAVID HORAN:

Respectfully submitted,

**SANFORDBETHUNE**

By: */s/  Brian P. Sanford*
    Brian P. Sanford
    Texas Bar No. 17630700
    David B. Norris
    Texas Bar No. 24060934

    3610 Shire Blvd., Suite 206
    Richardson, Texas 75082
    Telephone: (972) 422-9777
    Facsimile:  (972) 422-9733

**ATTORNEYS FOR PLAINTIFF
NENAD KOSTIĆ**

TABLE OF CONTENTS

Pages

OVERVIEW ...................................................................................................................... 1

INTRODUCTION ............................................................................................................. 1

ADDITIONAL MATERIALLY ADVERSE ACTIONS ................................................. 3

SUMMARY JUDGMENT STANDARD........................................................................... 6

I. IMMUNITY IS NOT APPLICABLE ......................................................................... 7

   A.  The immunity defenses are untimely and insufficient ............................................ 7

   B.  Material facts concerning immunity are in dispute .................................................. 9

       1.  Genuine issues of fact exist concerning qualified immunity to the Section 1983 retaliation claim ............................................................................. 10

          a.  Jang acted objectively unreasonably in connection with Kostić's protected speech .................................................................... 11

          b.  McKinney acted objectively unreasonably in connection with Kostić's protected speech .................................................... 15

          c.  Jones acted objectively unreasonably in connection with Kostić's protected speech .................................................... 16

          d.  Lemanski acted objectively unreasonably in connection with Kostić's protected speech .................................................... 22

          e.  Evans acted objectively unreasonably in connection with Kostić's Protected speech .................................................... 27

       2.  Kostić's activity and speech were protected although Kostić was a department head and a member of the faculty ................................................................. 28

       3.  Defendants portray Kostić to the Court as a trouble maker because of his protected speech and opposition to retaliation ................................................ 30

       4.  Defendants cannot whitewash their mendacity with an in-house termination in appeals process ...................................................................................... 31

   C.  Fact issues exist concerning Jang's official immunity to defamation claim.................................. 32

       1.  Jang did not act with discretion and good faith in the course of state employment ................ 34

II. RENEWED CLAIMS PREVIOUSLY CONSIDERED ........................................................35

    A.  Retaliation claims.................................................................................................................35

        1.  Kostić presents evidence that Jones acted with retaliatory animus .........................37

    B.  Defamation claim against Jang ...........................................................................................40

TABLE OF AUTHORITIES

Cases

*Arizona v. California*,
530 US 392 (2000) ...........................................................................................................8

*Barker v. Norman*,
651 F.2d 1107 n.16 (5th Cir. 1981) ............................................................................8, 9

*Bell Tel. Co. v. City of El Paso*,
346 F.3d 541 (5th Cir. 2003) ..........................................................................................8

*Bill Johnson's Restaurant, Inc. v. NLRB*,
461 U.S. 731 (1983) ........................................................................................................3

*Brown v. Callahan*,
623 F.3d 249 (5th Cir. 2010) .....................................................................................7, 10

*Burlington Northern v. White*,
548 U.S. 53 (2006) ........................................................................................................38

*Crawford-El v. Britton*,
523 U.S. 574 (1998) ......................................................................................................10

*EEOC v. Serv. Temps Inc.*,
679 F.3d 323 (5th Cir. 2012) ..........................................................................................8

*French v. French*,
385 S.W. 61 (Tex. App.–Waco 2012, pet. denied) ......................................................41

*Funding Sys. Leasing Corp. v. Pugh*,
530 F.2d 91 (5th Cir. 1976) ............................................................................................8

*Gomez v. Toledo*,
446 U.S. 635 (1980) ........................................................................................................7

*Hal v. Gillman, Inc.*,
81 F.3d 35 (5th Cir. 1996) ..............................................................................................6

*Ingraham v. United States*,
808 F.2d 1075 (5th Cir. 1987) ........................................................................................8

*Johnson v. State of La.*,
369 F.3d 826 (5th Cir.2004) .........................................................................................11

*Miller v. Raytheon*,
2013 WL 1845586  (5th Cir. May 2, 2013) ....................................................................3

*Pasco ex rel. Pasco v. Knoblauch,*
    566 F.3d 572 (5th Cir. 2009) ................................................................................................9

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997) ............................................................................................................5

*Saucier v. Katz,*
    533 U.S. 194 (2001) ............................................................................................................9

*Thornbrough v. Columbus and Greenville R.R. Co.,*
    760 F.2d 633 (5th Cir. 1985) ................................................................................................6

*Waggoner v. City of Garland,*
    987 F.2d 1160 (5th Cir. 1993) ..............................................................................................6

*Woodfield v. Bowman,*
    193 F.3d 354 (5th Cir. 1999) ................................................................................................8

Rules

Federal Rule of Civil Procedure 5(b)(2) ........................................................................................42

Federal Rule of Civil Procedure 56(d) ..........................................................................................41

Plaintiff Nenad Kostić responds to the second (renewed) motion for summary judgment filed by Defendants Texas A&M University at Commerce ("TAMUC"), Dan R. Jones, Larry F. Lemanski, Christine Evans, Ben W.-L. Jang, and Michael D. McKinney. Genuine issues of material facts require a trial of the legal claims submitted by Kostić. The motion should be denied.

## OVERVIEW

Kostić engaged in protected speech about religious favoritism and safety issues. Defendants retaliated. When Kostić defended himself and opposed the retaliation, Defendants retaliated more and ignored Kostić's complaints about retaliation. When Kostić continued to seek relief from the unlawful conduct, Defendants solicited and fabricated accusations against Kostić and harassed him with investigations and hearings. Because Kostić would not capitulate and resign, Defendants fired him on charges that destroyed Kostić's career, character, and reputation. Defendants freely acknowledge their antipathy to Kostić's opposition to Defendants' retaliation: "Kostić's almost non-stop series of denunciations over a three and a half year period, accompanied by constant accusations of defamation, retaliation, and violation of due process, along with repeated threats of litigation, were unreasonably disruptive in the small Chemistry department." [1]

## INTRODUCTION

Kostić continues to seek, and Defendants continue to avoid, a trial on the merits. The Court invited a motion on the qualified immunity and official immunity, and Defendants expand

---

[1] Dkt. No. 108 at 5.

their motion for a third bite at the apple on all issues. Defendants' motion for summary judgment addressed all of the issues. The Magistrate Judge considered all of the issues, except for claims of immunity.[2] Kostić's objection to the District Judge again raised all issues, except for claims of immunity.[3] The objection addressed not only the cat's paw issue, but also direct and circumstantial evidence of retaliation and issues related to the due process and defamation claims. Defendants responded to the objection with arguments on all issues.[4] Kostić replied to the response, rebutting all of the issues addressed again in Defendants' response.[5]

The District Judge considered all arguments and granted in part and denied in part Kostić's objection.[6] The District Judge then invited consideration on the only issues not reached by the Magistrate Judge: qualified and official immunity of individual defendants.[7] Defendants, in their renewed motion for summary judgment, raise not only the issues of immunity, but also all other issues previously considered by the Magistrate Judge and the District Judge. Because the Magistrate Judge and the District Judge have considered all of the issues except for immunity defenses, the Magistrate Judge may rely upon the District Judge's Order Accepting in Part and Rejecting in Part the Findings and Recommendation of the United States Magistrate Judge.[8] Kostić nevertheless addresses all of the renewed arguments, either in this response directly or by reference to previous pleadings indirectly.[9]

---

[2] Dkt. No. 100.
[3] Dkt. No. 102.
[4] Dkt. No. 103.
[5] Dkt. No. 104.
[6] Dkt. No. 105.
[7] Dkt. No. 106.
[8] Dkt. No. 105.
[9] Dkts. Nos. 81, 82, 83, 102, and 104.

Kostić has been arguing materially adverse actions other than termination of employment. Defendants have been minimizing or ignoring these adverse actions and emphasizing termination. Kostić introduced into summary judgment record many but not all materially adverse actions. These adverse actions separate from termination are relevant to individual liability because although McKinney has the final say on termination of employment, other defendants are responsible for retaliatory acts not only for causing the termination, but also leading up to and after the termination.

Kostić now expands the record with additional materially adverse actions, some of which are undisputed.[10] Multiple adverse acts should be considered in aggregate, not in isolation.[11]

## <u>ADDITIONAL MATERIALLY ADVERSE ACTIONS</u>

In addition to evidence for materially adverse actions Kostić gave in response to the original motion for summary judgment, Kostić includes additional evidence of criticism, threats, ostracism, retaliation for filing a charge with EEOC and TWCCRD; four additional police actions against Kostić personally; and a frivolous lawsuit lasting one and a half years and then non-suited.[12]

On January 27, 2009, Kostić complained to Crenshaw about Jang's unfairness and retaliation. Responding on January 28, 2009, Crenshaw criticized, belittled, and silenced

---

[10] Dkts. Nos.  81 and 102 at 12, § 5. Citations to Defendants' admissions in their answers are to corresponding paragraphs or subparagraphs in Dkts. Nos. 40 and 46. Kostić incorporates by reference the facts, arguments, authorities, and evidence presented in Dkts. Nos. 81 – 83, 102, and 104. Kostić extends the summary-judgment record with additional evidence in the appendix (designated Kos. Appx).

[11] *Cf. Miller v. Raytheon*, 2013 WL 1845586 at *4 (5th Cir. May 2, 2013) (considered in isolation, each category of evidence presented at trial might be insufficient, but the accumulation of circumstantial evidence and the credibility determinations required, could cause reasonable persons to differ about the presence of discrimination).

[12] *Cf. Bill Johnson's Restaurant, Inc. v. NLRB*, 461 U.S. 731, 743-44 (1983) (baseless lawsuit filed to retaliate against protected rights is enjoinable by NLRB).

Kostić.[13] In late January and February, 2009, TAMUC police and Crenshaw ignored Kostić's

repeated requests, in person and in writing, to investigate tampering with Kostić's computer and

desk drawers. Crenshaw, not Kostić, connected the tampering with Jang.[14]

Defendants admit that in mid-February 2010, Kostić complained to Lemanski that

ostracism was unfair and hurtful to Kostić and to students and professors collaborating with

Kostić.[15] Evans testified she was unconcerned about Kostić's complaint.[16] Jones was repeatedly

informed about Kostić's EEOC/TWCCRD charge on February 23 and 24, 2010.[17] Defendants

admit that the EEOC or TWCCRD notified TAMUC of Kostić's charge on or shortly before

February 25, 2010.[18] This timing is evidence of causation for the criminal investigation of

Kostić, launched on February 25, 2010; accusations solicited and fabricated in early March,

2010; investigations and hearing by the Fullwood committee in March and April, 2010; and

other acts that are already in the record.

From early March, 2010 onward, Kostić was no longer invited to faculty meetings, and

was excluded from departmental business and communication.[19] After the Myers committee

hearing and before dismissal, Defendants stepped up pressure on Kostić to make him resign. In

November and early December of 2010, TAMUC police acted against Kostić twice on campus

and twice at his home. After the sudden police raid at Kostić's office on October 27, 2010, and

his permanent expulsion from campus, Kostić was allowed to return once and collect several

items from his office. An armed police officer needlessly guarded Kostić in public view. At

---

[13] Kos. Appx 232.
[14] Kos. Appx 250-51, 253-54 13-15.
[15] Dkts. No. 40, 46 ¶ 100.
[16] Kos. Appx 342; 4.
[17] Kos. Appx 247; 309; 307; 312; 308; 310.
[18] Dkt. Nos. 40 and 46, ¶ 102.
[19] Kos. Appx 431-433.

parting, Kostić politely advised Dean Attardo, a new administrator, not to allow TAMUC administration to corrupt him. Defendants admit that police officers sent by Donna Spinato escorted Kostić in the recreation center and followed him inside the locker room.[20] This needless escort by armed officers publicly humiliated Kostić.[21]

Defendants admit that Vieira and a police officer came to Kostić's home on November 23 and December 3, 2010.[22] Kostić had previously asked Vieira to send any documents by email. Harassers came uninvited and unannounced, upsetting Kostić at his home. Vieira and police did not visit any other faculty member at home. Spinato briefed Bob Brown, Jones's direct subordinate, about the missions to Kostić's home.[23] Kostić protested harassment and public humiliation and forbade TAMUC officials from badgering him at home.[24]

An employee may recover for post-employment retaliation.[25] After Kostić's expulsion and termination, and for more than a year into this lawsuit, Kostić's office remained full of his books, files, and art. Knowing that Kostić was represented, Lemanski nevertheless directed his subordinates Sandy Weeks and Grady Blount, neither of whom knew Kostić, to pressure Kostić directly. The subordinates wrote in June and September, 2011, threatening to dispose of Kostić's personal property. Kostić offered to evacuate his office on Defendants' terms, but no one answered. Banned from campus under threat of criminal trespass, Kostić could only worry and fear for his irreplaceable career tools and other property. In December, 2011, Defendants had

---

[20] Dkt. Nos. 40, 46, ¶ 257(b).
[21] Kos. Appx 58-59, 74-75.
[22] Dkt. Nos. 40, 46, ¶ 257(a).
[23] Kos. Appx 252; 429; 77, 202; 246.
[24] Kos. Appx 59; 60.
[25] *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (term "employees" under Title VII anti-retaliation provision includes former employees).

Kostić's property removed to Fort Worth, approximately 100 miles away, although a storage facility was available approximately 100 yards from campus.[26]

In March, 2011, Lemanski, represented by his son, sued Kostić for defamation. The petition did not identify the alleged defamatory statements by Kostić. In January, 2012, Lemanski subjected Kostić to 609 requests for admission, none of which mentioned, or pertained to, the purported defamation. Many of the requests disparaged and insulted Kostić. In October, 2012, Lemanski non-suited the case, and the court dismissed it.[27]

## <u>SUMMARY JUDGMENT STANDARD</u>

In general, summary judgment is an inappropriate tool for resolving claims of employment discrimination, which involve nebulous questions of motivation and intent.[28] On summary judgment, the question is not whether the plaintiff proves pretext, but whether the plaintiff raises a genuine issue of material fact regarding pretext.[29]  Kostić has not argued for purposes of summary judgment that any witness should be disbelieved simply for being a TAMUC employee. Of course, a jury may do so freely at trial. Instead, Kostić has rebutted, refuted, and disputed testimony of TAMUC witnesses with admissible evidence.[30] Defendants cannot identify substantial, much less "overwhelming," evidence in their favor. Kostić's uncontroverted evidence and undisputed facts mandate at a minimum a trial, and justify a summary judgment in Kostić's favor on the merits.

---

[26] Kos. Appx 227-28;  257-73.
[27] Kos. Appx 172-24.
[28] *Thornbrough v. Columbus and Greenville R.R. Co.,* 760 F.2d 633, 640 (5th Cir. 1985). *See also Waggoner v. City of Garland*, 987 F.2d 1160, 1164 (5th Cir. 1993).
[29] *Thornbrough*, at 646; *Hal v. Gillman, Inc.,* 81 F.3d 35, 37 (5th Cir. 1996).
[30] Dkt. Nos. 81, 82, 83, 102, and 104.

## I.  IMMUNITY IS NOT APPLICABLE

### A.  The immunity defenses are untimely and insufficient.

In a §1983 action against a public official whose position might entitle him or her to qualified immunity, a plaintiff need not allege that the official acted in bad faith in order to state a claim for relief; the burden is on the defendant to plead good faith as an affirmative defense.[31] Once an official pleads the defense of qualified immunity, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's conduct violated clearly established law.[32]

Defendants' answer to Plaintiff's second amended complaint, the live pleading, does not include any affirmative defenses.[33] Defendants raised the immunity defense in their motion for summary judgment on August 30, 2012, almost eight months after the pleading deadline and one month after the discovery deadline.[34] Kostić relied upon the pleading as he was requesting production and deposing witnesses. Kostić was not exploring immunity and other possible affirmative defenses. Kostić's motion to compel production is pending.

Defendants argue that they asserted affirmative defenses by answering Kostić's allegations.[35] They did not.[36] In their live answer, defendants made factual statements, not legal assertions. Defendants merely denied that their actions had been unlawful; they did not assert their immunity for acting as they had acted. They never used the word *immunity*.

---

[31] *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).
[32] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).
[33] Dkt. No. 46.
[34] Dkt. No. 61 at 57.
[35] Dkt. 62, section VII-A.
[36] Dkts. Nos. 40, 46 (¶¶ 200, 270, 272, 288).

Affirmative defenses are subject to the same pleading requirements that apply to complaints.[37] A defendant must plead an affirmative defense with enough factual specificity to give the plaintiff "fair notice" of the defense.[38] Defendants' Answer to Plaintiff's Second Amended Complaint[39] does not provide any notice of any affirmative defenses.

Generally, if not asserted in a responsive pleading, the affirmative defense is waived, and evidence of such defense is inadmissible at trial.[40] Some courts, however, allow the defense for the first time in a motion for summary judgment.[41] Defendants' motion for summary judgment was not their initial pleading. Defendants included qualified immunity in their initial answers but removed this and all other affirmative defenses in their answer to Kostić's second amended complaint.

Defendants are in effect attempting to amend the answer after the pleading deadline to add affirmative defenses, but without requesting leave to amend. To be allowed an amendment to a pleading after the deadline, a defendant must demonstrate good cause.[42] The four factors relevant to good cause are: (1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice.[43]

Assuming that motion for summary judgment is an acceptable form of pleading an affirmative defense, Defendants have not addressed any of the four factors for allowing an

---

[37] *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999).
[38] *Id.*
[39] Dkt. No. 46.
[40] *Arizona v. California*, 530 US 392, 410 (2000); *Ingraham v. United States,* 808 F.2d 1075, 1079 (5th Cir. 1987).
[41] *See Barker v. Norman*, 651 F.2d 1107, 1120 n.16 (5th Cir. 1981) (citing *Funding Sys. Leasing Corp. v. Pugh,* 530 F.2d 91, 95-96 (5th Cir. 1976) (affirmative defense may be raised by summary judgment motion when the motion is the initial pleading tendered by defendants)).
[42] *See EEOC v. Serv. Temps Inc.*, 679 F.3d 323, 333-34 (5th Cir. 2012).
[43] *Id.* (quoting *Sw. Bell Tel. Co. v. City of El Paso*, 346 F.3d 541, 546 (5th Cir. 2003)).

affirmative defense after the pleading deadline. They have not shown and cannot show good cause. Discovery is complete, except for a pending motion to compel. Kostić will be prejudiced by the amendment. Accordingly, Defendants have not met their initial burden to plead the affirmative defense.

Assuming, further, that Defendants can show good cause to raise the affirmative defense in the motion, Defendants must give specific, material facts about their alleged immunity; only then can Kostić dispute these facts.[44] A defendant claiming qualified immunity must demonstrate objective circumstances compelling the conclusion that the defendant's actions were undertaken pursuant to the performance of his or her duties and within the scope of his or her authority.[45] Defendants do not show, for example, how ostracism at work, police harassment at home, and a frivolous lawsuit against a fired employee, non-suited after a year and a half, are within Defendants' discretion and scope of authority.

**B. Material facts concerning immunity are in dispute.**

If the Court finds that the affirmative defenses of qualified and official immunity are properly raised in the motion for summary judgment, Kostić presents evidence of genuine issues of material facts regarding the application of these defenses. To defeat defendant's motion for summary judgment on its merits, a plaintiff must show that (1) the defendant's conduct was unlawful because it violated a constitutional right; and (2) the right was clearly established at the time of the official's conduct.[46] To show that the conduct was plainly unlawful when it occurred, the evidence must show that no reasonable person in the defendant's position could have thought

---

[44] *See Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577-78 (5th Cir. 2009).
[45] *Barker v. Norman*, 651 F.2d at 1120.
[46] *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

that the facts justified the action taken – that the official knew or should have known that the conduct violated plaintiff's constitutional rights.[47] All inferences are drawn in plaintiff's favor.[48] Kostić presents facts that show that each individual Defendant knew or should have known that his or her conduct violated Kostić's constitutional rights.

**1. Genuine issues of fact exist concerning qualified immunity to the Section 1983 retaliation claim.**

That Kostić repeatedly spoke out on matters of public concern is undisputed. Establishment of a religion in a public university, hazardous practices resulting in an explosion and a fire in student laboratories, exposure of unprotected custodians to a toxic environment, and a high administrator's misrepresented credentials in a job application are public, not Kostić's private, concerns. Retaliation for acts protected by Title VII, the First Amendment, or both also are matters of public concern. Reporting these matters is protected speech.

All relevant laws – Section 1983 and First Amendment – were firmly established before and during the time relevant here. Kostić admonished individual defendants in writing about their retaliation and violation of the First Amendment.[49] Defendants knew the laws, or they should have known the laws. Each individual defendant acted objectively unreasonably toward Kostić and in matters concerning Kostić for reasons related to Kostić's protected speech.

Kostić introduced into the record selected, not exhaustive, facts and evidence concerning Kostić's speech concerning Title VII violations and defendants' retaliation,[50] and concerning Kostić's speech concerning safety violations and Lemanski's misrepresented credentials, and

---

[47] *See Crawford-El v. Britton*, 523 U.S. 574, 591 (1998).
[48] *See Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).
[49] Dkt. No. 81 at 43.
[50] Dkt. No. 81, §§ 9, 11-17, 19, and 21.

defendants' retaliation.[51] Kostić's speech on all of these subjects was of public concern, and was protected by the First Amendment.

For a defendant to be liable under Section 1983 for retaliation, the defendant must have been the "final decision-maker."[52] To determine the final decision-maker, the Court must determine the adverse action. For termination, the final decision-maker is McKinney; for other adverse actions, the final decision-makers are the persons who made the final decision on the particular adverse action. For example, the person who made the final decision to send police against Kostić and the persons who jointly made the final decision to suspend Kostić are the final decision-makers for these two adverse actions. Lemanski and Evans jointly suspended Kostić.[53]

### a. Jang acted objectively unreasonably in connection with Kostić's protected speech.

On or about March 29, 2007, at a dinner with faculty colleagues, Kostić criticized TAMUC for wasting public funds on scholarships for hundreds of undeserving persons who were students in name only. In a memorandum of April 11, 2007 to top administrators, Jang denounced Kostić's speech as disloyalty to TAMUC.[54] Jang took the lead in preparing the April 11, 2007 memorandum, where he characterized Kostić's statement about wasted scholarships as "untruthful." In deposition, however, Jang did not dispute the accuracy of Kostić's statement, but testified that Kostić's voicing an opinion was misconduct.[55]

---

[51] Dkt. No. 81, §§ 18, 19, 21, 22, and 25.
[52] *See Johnson v. State of La.,* 369 F.3d 826, 831 (5th Cir.2004).
[53] Dkt. No. 81 at 15(c).
[54] Kos. Appx 178-182.
[55] Kos. Appx 348-49; Dkt. No. 63 at APP 1200-02; Kos. Appx 357; 377-381; 350.

Defendants concealed the memorandum and its content from Kostić. Jang did not tell Kostić about the memorandum. Kostić discovered the memorandum in September, 2010.[56]

Waste of financial aid by the System universities became a public issue, the Texas legislature's concern, and the subject of editorial criticism in the press.[57] Alexandra Vonausdall fabricated her vita for TAMUC. She copied invented credentials – two academic degrees in English and two theses at two nonexistent universities – from a vita existing on the Internet, which features a nameless scholar, a nonexistent address, and directory-assistance telephone number as the purported scholar's private telephone. Vonausdall inserted into this vita her name, address, and telephone number, and Jang's chemistry department posted this construct on TAMUC's web site. Vonausdall variously presented herself as an undergraduate student, graduate student, and graduate assistant at TAMUC studying computer science, political science, animal science, and chemistry. In the schedule of classes, she styled herself  a "faculty contact" in the chemistry department.[58]

Vonausdall contradicts herself in this case as well. In her email to Jones and Lemanski on April 9, 2010, she claimed she was a "graduate student" and spelled her first name one way. In her affidavit, she claimed that she was "an undergraduate student and tutor at [TAMUC] during 2010," and that "during the early part of 2010" she was "a tutor and Teacher's Assistant." She spelled her first name differently.[59] Although Vonausdall lacks chemistry credentials and did not claim chemistry credentials in her fabricated vita, Jang was appointing her and paying her from

---

[56] Kos. Appx 351; 65; 366.
[57] Kos. Appx 158.
[58] Dkt. No. 63 at APP 1215-16; Kos. Appx 204;145-47; 148-49; 142-44, 150-53; 392-96.
[59] Dkt. No. 63 at APP 1215-16; Kos. Appx 204.

public funds to teach, grade, and tutor students in chemistry. Bukuo Ni was the third member of this alliance against Kostić.[60]

Defendants relied on Vonausdall in firing Kostić, and they rely on her in this lawsuit. Defendants criticize Kostić's claim that Vonausdall is incompetent in chemistry. Defendants argue that "'the court should give credence to the . . . evidence …' especially when it 'comes from disinterested witnesses,' such as Ms. Von Ausdall." This is one of the various forms of this woman's last name.[61]

It is undisputed that Bukuo Ni's laboratory failed multiple safety inspections both before and after the chemical fire in Ni's laboratory; that the fire ruined the laboratory and contaminated the Science Building on March 15, 2010; that an official investigation implicated Ni's researchers and Jang in the fire; and that from March until May, 2010, Kostić was speaking out within TAMUC and in the news media about hazardous practices and a cover-up after the fire. In April, 2010, Vonausdall and Jang prepared, and Vonausdall was circulating as a petition, four versions of a memorandum, the last three of which falsely libeled Kostić. This denunciation was retaliation for Kostić's speech about Ni's recklessness, the fire, and defendants' misconduct after the fire.[62]

Jang spent his one-semester sabbatical leave at TAMUC, he remained involved in the Kostić matters, and he was personally involved in the fire in Ni's laboratory. Jang and Vonausdall had talked about Kostić. Jang knew the first version of the petition was not aimed against Kostić, but was intended to benefit the chemistry department. Jang was department head,

---

[60] Kos. Appx 393; 397-98.
[61] Dkt. Nos. 108 at 17, FNT 7; and 103 at 4.
[62] Kos. Appx 301-05; 275 – 81.

and he stated, "I put the needs of the department and the university before me."  All four versions of the memorandum praised Jang's protégé Ni, and knowledgeably summarized Ni's research in the way that Vonausdall in her ignorance could not have done. It is undisputed that Jang disliked Kostić, reprimanded him, threatened him with dismissal, removed him from a research laboratory, sent police against him, and more. Jang also wrote to Jones about their " 'cooperat[ion]' to catch the bigger fish."[63] A reasonable person would infer that the "bigger fish" is Kostić and that it was Jang who praised Jang's protégé Ni and denounced Kostić in the petition that Jang's other protégé, and Ni's friend, Vonausdall, was circulating in and around Jang's chemistry department for a month, collecting more than 400 signatures.

In the first half of 2009, Kostić complained, and helped Chunkai Shi complain, about Jang's nepotism and using of TAMUC laboratories and offices for his children's amusement. Jang knew he was being investigated because of Kostić and Shi's complaints.[64] Jang admitted that his daughter, Kristine Jang, is a graduate student in chemistry at TAMUC. Jang recommended his daughter for admission; he has been appointing her as a chemistry teacher; he has been paying her from public funds; and he has been supervising her in her M.S. thesis research.  Lemanski testified that Kristine Jang could keep the teaching job her father gave her, and serve under her father in the chemistry department.[65]

Jang's using of his position and of TAMUC facilities for his family's benefit is a matter of public concern. Jang's removal of Kostić from the research laboratory, poor and false evaluation of Kostić's work, and the police raid in January, 2009; and the repeated police raid in

---

[63] Kos. Appx 237-38;178-82; 352-53; Dkt. No. 63 at APP 1200-02; Dkt. No. 63 at APP 1200-02; Kos. Appx 313-15.
[64] Dkt. No. 81 at 24; Dkt. No. 83 at K.Appx 484-5, 738, 746, 948.
[65] Kos. Appx 159, 160-67; 140-41; 154-55; 168-69; 170-71; 411-12.

March, 2009 were motivated in part by Kostić's speech on these matters of public concern.

Davis was willing to testify for Kostić in the appeal hearing. Jang forbade Amy Davis from

communicating with Kostić. In his deposition, Jang testified that Kostić had a right to

communicate with Davis.[66]

### b. McKinney acted objectively unreasonably in connection with Kostić's protected speech.

In a letter to McKinney, and similar letters to the System general counsel and a regent,

Kostić complained about Lemanski's misrepresentations and retaliation.  McKinney ignored

Kostić's complaints.[67] Jones sent his first termination recommendation to McKinney on or after

November 30, 2010.[68]  Jones later sent additional documents, including a transcript of the appeal

hearing, which McKinney's office received on December 6, 2010.[69] Jones never produced to

Kostić all documents he sent to McKinney in support of the dismissal recommendation. If this

record contained only the dossiers supplied by TAMUC and Kostić and the hearing transcript,

the record contained more than 1,000 pages. McKinney's dismissal letter is dated December 8,

2010. Evidently, McKinney made his decision in the period from December 6 to December 8,

2010.

McKinney dismissed Kostić without addressing evidence of retaliation, including

voluminous documents and sworn testimony, in the record before him. System policy provided

for McKinney's own investigation, which he did not make, and for Jones's further investigation,

---

[66] Kos. Appx 107; 353.
[67] See admissions in Dkts. Nos. 40 and 46, ¶¶ 188, 254(a); See Dkt. No. 81 at 47; Kos. Appx 131-32; 185.
[68] Kos. Appx 191-201; 203.
[69] Kos. Appx 189-90.

*Plaintiff's Response to Defendants' Second (Renewed) Motion for Summary Judgment*                    *Page 15*

which McKinney did not order.[70] In his short dismissal letter, McKinney did not state why he was dismissing Kostić; he simply relied on Jones's recommendation.[71] McKinney's letter of December 8, 2010 was sent to Kostić on January 26, 2011. Kostić received it on January 28, 2010.[72] McKinney's handling of his decision and the delayed notification are objectively unreasonable.

### c.   Jones acted objectively unreasonably in connection with Kostić's protected speech.

Defendants admit that "[o]n April 16, 2009, Kostić filed with Jones a seven-page, 15-count complaint against TAMUC and the System for encouraging misconduct and retaliation by Jang and his allies." Kostić complained about issues of public concern including "waste of public funds," "subversion of university's education mission," "ethnic and religious discrimination," and more. Kostić also criticized Jones, and asked Jones to forward the complaint to the System. It is undisputed that Jones neither investigated Kostić's  complaint nor forwarded it to the System.  Jones testified he had a duty to forward to McKinney any allegation that Jones violated policies or rules.[73]

Defendants admit that "In May 2009, Kostić asked Jones and Peer to act on his complaints of February 6, March 18 (filed March 23), March 26, and April 16, 2009.  Jones replied that Kostić's complaints 'are being taken seriously and are being investigated.'" In fact, Jones was ignoring Kostić's complaints, planning to fire Kostić for cause, and concealing from Kostić this plan and actions. Kostić complained about issues of public concern, namely

---

[70] Kos. Appx 82-83.
[71] Kos. Appx 78.
[72] Kos. Appx 76.
[73] Dkt. 40 and 46, ¶ 79; Kos. Appx 363-64; 2; 364; 361-62.

establishment of religion, waste of public funds, and religious discrimination and favoritism at TAMUC.[74]

Defendants admit that in his charge to the EEOC and TWCCRD Kostić alleged, inter alia, the following: "Jang's persistent and coercive proselytization and religious favoritism in appointments and administration; religious influence in TAMUC curriculum; and public, religious ceremonies at TAMUC conducted by top TAMUC officials."  These issues in the public university are of public interest.[75]

It is undisputed that on February 23 and 24, 2010, the System, TAMUC, and Jones learned from multiple sources that Kostić had filed a charge with the EEOC and TWCCRD. Defendants admit that "EEOC or TWCCRD notified TAMUC of Kostić's charge on or shortly before February 25, 2010. Vieira, who is the equal-opportunity officer, handles these matters." Defendants also admit that "[o]n February 26, 2010, one or two days after receiving Kostić's EEOC/TWCCRD charge, Vieira reported Kostić to TAMUC police,… police launched a criminal investigation of Kostić." It is undisputed that Vieira was Lemanski's subordinate at the time, that the criminal investigation without Kostić's knowledge lasted until March 31, 2010, and that no criminal charges were filed as a result of it.[76]

Answering Interrogatory No. 9, Jones stated that "TAMUC did not become aware that Dr. Kostić alleged such opposition" (meaning "opposition to TAMUC's advocating religion in the university curriculum and at official TAMUC functions") "until the termination hearing before the Hearing Committee." It is undisputed, however, that this hearing occurred on

---

[74] Dkt. Nos. 40 and 46, ¶¶ 82, 157; Kos. Appx 1-3; 364; 368; Dkt. No. 63 at APP 1205-07; Kos. Appx 365.
[75] Dkt. Nos. 40 and 46, ¶ 97.
[76] Dkt. Nos. 40 and 46,  ¶¶ 102, 107; Kos. Appx 247; 309; 307; 312; 308; 310; 311; 426; 47-54.

November 9, 2010 eight months after Kostić clearly stated his opposition in his EEOC/TWCCRD charge. Jones's answer to Interrogatory No. 9 is false.[77]

It is undisputed that, from March 15, 2010 until May, 2010, Kostić was speaking out at TAMUC about the chemical fire in Ni's laboratory, unsafe practices, contaminated building, exposure of custodians, suppression of speech, and cover-up. Because Defendants and other officials ignored Kostić's quiet warnings for three weeks, Kostić agreed to speak to newspaper and television reporters in April, 2010.[78]

Beginning several days after the fire and continuing through April, 2010, Vonausdall was collecting some 400 signatures for four versions of a memorandum, all of which praised Ni. The close timing and praise of Ni prove that Vonausdall's petition arose from the fire and its aftermath. Petition authors originally intended to obtain more resources for the chemistry department, not to criticize Kostić.[79]   In early April, 2010, the administration instructed faculty and students not to talk to the media about the fire. Jones agreed with the instruction.[80] Brown and Jones contradicted each other under oath about who issued the instruction.[81] Defendants admit that, on April 4, 2010, Kostić wrote to Evans, Lemanski, and others; claimed public interest; protested censorship and cover-up; invoked freedom of speech, academic freedom and Governor's order about safety; and demanded the gag order be lifted.[82] Defendants admit that no one replied to Kostić.[83]

---

[77] Kos. Appx 323 Irog 9; Kos. Appx 18-45.
[78] Kos. Appx 435; Dkt. No. 63 at APP 1210-11.
[79] Dkt. No. 63 at APP 1200-02.
[80] Kos. Appx 366-67; 367.
[81] Kos. Appx 334; 323 Irog 10.
[82] Kos. Appx 62.
[83] For admissions, see Dkt. Nos. 40 and 46, ¶ 176; Dkt. No. 81, § 18 and evidence cited therein;

On April 8, 2010, Vonausdall submitted to Jones and Lemanski the first version of a petition, remarkably dated April 30, 2010 and accompanied with 215 signatures.[84] The first version of the petition was aimed at Jones but did not mention Kostić.[85]  Jones did not question the validity of the impossibly postdated memorandum and trusted Vonausdall.[86] Jones and Lemanski communicated about the memorandum.[87]  On the evening of April 8, 2010, Kostić appeared in a television newscast with TAMUC's public-relations officer and spoke critically about the fire. Jones is routinely informed about the public-relations officer's media appearances.[88]

On April 9, 2010, Vonausdall offered to Jones to collect student signatures for Kostić's dismissal from TAMUC.[89] From the outcome of the offer, a jury can determine what Jones did. The second version of the petition, dated April 15, 2010, no longer mentioned Jones but stated that Kostić had "fostered an atmosphere of hostility, discrimination in the form of favoritism, unfair grading practices, and sexual harassment." [90] Third and fourth versions of the memorandum, dated April 20 and 24, 2010, changed in content and appearance but denounced Kostić with the same words.[91] The second and third versions state, referring to Kostić, "this type of faculty is a detriment to the Chemistry department and the school." [92] The fourth version makes the accusation explicit, stating, "faculty members like Dr. Kostić are a detriment to the

---

[84] Kos. Appx 204; 8; Dkt. No. 61 at 41-2; Dkt. No. 61 at 41-42.
[85] Kos. Appx 214-26.
[86] Kos. Appx 370.
[87] Kos. Appx 204; 369; 416-17.
[88] Kos. Appx 366-67.
[89] Kos. Appx 204.
[90] Kos. Appx 205-13.
[91] Kos. Appx 282-97;16.
[92] Kos. Appx 205-13; 282-97.

Chemistry department and to the school."[93] The same lists, exceeding 215 signatures ultimately growing to more than 400 signatures, were attached to materially and conspicuously different versions of the memorandum. Lemanski talked with Jones about the second version, which denounced Kostić.[94] Jones trusted different petitions with the same signature sheets.[95]

Someone instructed Vieira to follow up with signers of the purported petition.[96] On or after May 25, 2010, Vieira solicited criticism of Kostić from some 400 students whose signatures Vonausdall had collected.[97] Vieira "received very little response" or "for the most part, nothing" in return. Only one student responded, saying he or she had signed without knowing what the petition was for.[98] Vieira did not mention anyone's fear.  Answering Interrogatory No. 9, however, Jones stated that "[n]o students contacted would provide specific details of sexual harassment directed towards them, citing fears of retaliation."[99]  Defendants have no evidence for Jones's statement, which is false. Amy Davis and Tiffany Lee testified under oath that Vonausdall had failed to show them the petition before they signed the signature sheet and that they did not know what they were signing. Davis was upset that Vieira's solicitation was aimed at Kostić, whom Davis respects. [100]

On June 17, 2010, Jones nevertheless used the petition as a termination charge against Kostić.[101] Jones did not use the first version, in which he was negatively named and Kostić not mentioned. Jones, however, used against Kostić the signatures attached to that first version,

---

[93] Kos. Appx 16.
[94] Kos. Appx 416-17; 322  Irog 7, para 13.
[95] Kos. Appx 371; Dkt. No. 81, § 18 and evidence cited therein.
[96] Kos. Appx 427.
[97] Kos. Appx 298-99.
[98] Kos. Appx 427; 427-28.
[99] Kos. Appx 322 interrogatory no.7, para 13.
[100] Kos. Appx 108-10; 115-16.
[101] Kos. Appx 63-64.

*Plaintiff's Response to Defendants' Second (Renewed) Motion for Summary Judgment*                    *Page 20*

negative about Jones. In deposition and in his answer to Interrogatory No. 7, Jones contradicted himself about the version of the petition he used for dismissal of Kostić. To Jones, the purported petition was evidence that students disliked Kostić.  Jones and Lemanski, who was Vieira's supervisor, concealed the solicitation and the nonresponse from Kostić and the Myers committee, hearing Kostić's appeal.[102]

Apart from the dismissal proceedings, Jones and his subordinates Lemanski and Brown decided to expel Kostić from TAMUC before the Myers committee heard Kostić's appeal.[103] Evans testified that, on October 25, 2010, in a meeting in Evans's office, Kostić had asked Evans if she would testify in Kostić's upcoming lawsuit. Evans also testified that Kostić had spoken and behaved normally and had not asked Evans to lie. Evans postponed her decision, and Kostić waited. On October 26, Evans declined to be a witness. Kostić accepted her decision. Evans said Kostić had a right to ask Evans.[104] Contrary to Jones's answer to Interrogatory No. 7,[105] Evans did not "contact UPD." ("UPD" stands for University Police Department). Rather, Donna Spinato, TAMUC police chief, contacted Evans and unsuccessfully tried to elicit from Evans a complaint against Kostić. Spinato testified that she had met with Jones, Brown, and McBroom. No one talked to Kostić. Using the pretext that "some people were saying" that Kostić had threatened Evans, Jones and Brown ordered that Kostić be expelled from campus.[106] On October 27, 2010, TAMUC police suddenly and permanently expelled Kostić from TAMUC less than two weeks before the hearing, not "after the hearing," as Jones falsely states in his answer to

---

[102] Dkt. No. 81, § 18 and evidence cited therein.
[103] Kos. Appx 329; 330.
[104] Kos. Appx 133; 343-44; 344; 344; 345.
[105] Kos. Appx 322  Irog 7, para 17.
[106] Kos. Appx 111-14.

Interrogatory No. 7.[107] The official expulsion order does not show any offense by Kostić and does not give any reason for his expulsion.[108] Kostić protested retaliation in writing.[109] Spinato forwarded Kostić's protest to defendants.[110] Texas law prohibits making false reports to police. The expulsion order provided Kostić with the right to appeal to Spinato.[111] Despite Kostić's repeated requests, Spinato refused to give the reason for expulsion and thus prevented Kostić from appealing his expulsion.[112]

### d. Lemanski acted objectively unreasonably in connection with Kostić's protected speech.

It is undisputed that, from March 15, 2010 until May, 2010 Kostić was speaking out – first at TAMUC and, after his quiet warnings were ignored, also in the news media – about the chemical fire in Ni's laboratory, unsafe practices, contaminated building, exposure of custodians, suppression of speech, and cover-up. Beginning after the fire and continuing through April, 2010,Vonausdall was collecting some 400 signatures for four versions of a memorandum, all of which praised Ni. The close timing and praise of Ni prove that Vonausdall's petition arose from the fire and its aftermath.

Defendants admit that, on April 4, 2010, Kostić wrote to Evans, Lemanski, and others; claimed public interest; protested censorship and cover-up; invoked freedom of speech, academic freedom and Governor's order about safety; and demanded the gag order be lifted.  Defendants admit that no one replied to Kostić.[113]

---

[107] Kos. Appx 322  Irog 7, para 17.
[108] Kos. Appx 233.
[109] Kos. Appx 67.
[110] Kos. Appx 248.
[111] Kos. Appx 67.
[112] Kos. Appx 55-57; 68-75; 274.
[113] For admissions, see Dkts. Nos. 40 and 46, ¶ 176; Kos. Appx 62.

*Plaintiff's Response to Defendants' Second (Renewed) Motion for Summary Judgment*                    *Page 22*

Lemanski's office placed Kostić under surveillance. Lemanski's subordinate Vieira and

TAMUC police surveilled Kostić. On April 5, 2010, a student reporter approached Kostić about

the fire. They talked. Sherman surveilled them and informed Vieira, who then informed

Lemanski.[114] Defendants admit that Lemanski appointed a committee to inquire about the fire

and that Kostić complained to the committee that the gag order violated constitutional rights and

damaged safety.[115] Lemanski testified he had heard of Kostić's public statements about the fire

and seen the press stories.[116]

In the spring semester of 2010, Kostić was speaking out about hazardous practices at

TAMUC. Evans testified that in that semester, Lemanski and Evans met with a group of fewer

than a dozen chemistry students and faculty members. Kostić was talked about, but was neither

invited nor informed of the meeting. Defendants resist Kostić's requests for production of

documents including emails concerning the meeting.[117]

Lemanski knows Alexandra Vonausdall. On April 8, 2010, Vonausdall submitted to

Jones and Lemanski the first version of her memorandum, impossibly dated April 30, 2010, with

215 signatures attached. The first version did not mention Kostić. Jones forwarded the petition to

Lemanski. Jones and Lemanski communicated about the memorandum.  In the evening of April

8, 2010, Kostić spoke critically about the fire in a television newscast. On April 9, 2010,

Vonausdall offered to Jones and Lemanski to collect student signatures for Kostić's dismissal

from TAMUC. The next three versions of the petition, dated April 15, 20, and 24, 2010, varied

in content and appearance, but each falsely stated that Kostić had "fostered an atmosphere of

---

[114] Kos. Appx 249; 435; Dkt. No. 63 at APP 1210-11; Kos. Appx 111; 234-35; 255-56.
[115] See Dkt. Nos. 40 and 46, ¶ 179; Kos. Appx 229-31.
[116] Kos. Appx 414-16.
[117] Kos. Appx 341.

*Plaintiff's Response to Defendants' Second (Renewed) Motion for Summary Judgment*          *Page 23*

hostility, discrimination in the form of favoritism, unfair grading practices, and sexual harassment." The signatures attached to the first version, which did not mention Kostić, continued to be used against Kostić.[118]

Colt Smithson accused Kostić of "favoritism, subjective grading practices, and blatant harassment…" The seven-word pattern "favoritism, *adjective* grading practices, and *adjective* harassment," in which five words are the same and two are adjectives in the same positions, cannot appear by chance in Smithson's and Vonausdall's short texts in March and April, 2010, respectively. It is undisputed that Smithson gave his complaint, dated March, 2010, to Vieira. At all relevant times, Vieira reported to Lemanski, and she handled complaints to Lemanski's office concerning faculty. It is undisputed that Vieira continued Vonausdall's work in May, 2010 by soliciting petition signers. A reasonable person could infer the connection between an occurrence in April, 2010, between Vieira's actions in March and May, 2010: the word pattern from Smithson's complaint appeared in Vonausdall's petitions in April, 2010.[119]

Someone instructed Vieira to follow up with signers of the purported petition. A jury will notice that Vieira reported to Lemanski. On or after May 25, 2010, Vieira solicited criticism of Kostić from some 400 students whose signatures Vonausdall had collected. Vieira "received very little response" or "for the most part, nothing" in return. The only student whose response Vieira testified about, but also Amy Davis and Tiffany Lee, all complained that Vonausdall had failed to show them the petition before they signed the signature sheet and that they had not known what they had signed. Vieira's supervisor, Lemanski, concealed the failed solicitation

---

[118] Kos. Appx 416-17; 204; 214-26; 369; 205-13; 282-97; 16.
[119] Kos. Appx 64; 205-13; 282-97; 16; 426.

from Kostić and the Myers committee, to which Kostić was appealing the dismissal. Lemanski thought Vieira's solicitation appropriate.[120]

Lemanski's office ordered surveillance of Kostić. Lemanski's subordinate Vieira and TAMUC police participated in the surveillance. When Kostić asked TAMUC police about the surveillance, the police notified Vieira of Kostić's inquiry. Vieira became nervous.[121]

Alexander Kemos, the third highest administrator at the biggest university in the System, misrepresented his military service and more in his job application. In mid-2010, this scandal reached the national press. Lemanski materially misrepresented his military service in his 2008 job application to TAMUC.  He obtained the second highest position at TAMUC, with salary and benefits from public funds. Defendants admit that in October 2010, Kostić lawfully obtained Lemanski's service records, reported the discrepancies to McKinney, invoked public interest, referred to the Kemos scandal, and asked for an investigation. [122] After Kostić's report, Lemanski substantially revised his claim of military service in his vita.[123]

Lemanski accused Kostić of "falsifying facts" and of falsely accusing Lemanski. In deposition, Lemanski admitted that his service dates were wrong by four years; that he wrongly stated the military branch; and that his infrequent training was not continuous service. Lemanski characterized these discrepancies as "very minor." After the System auditors confirmed these discrepancies, Lemanski embraced the auditors' finding as his own position. Lemanski was not

---

[120] Kos. Appx 298-99; 427; 427; 108-110; 427-28; 418-19.
[121] Kos. Appx 111; 234-35; 255-56; 249; Dkt. No. 63 at APP 1210-11.
[122] See Dkts. 40 and 46, ¶ 188, 254(a).
[123] See also Dkt. 81 at 47; Kos. Appx 131-32; 185.

disciplined in any manner. Jones officially learned from the System about Kostić's exposé and the System's audit of Lemanski, but Jones did not mention the issue to Lemanski.[124]

Lemanski misrepresented to the Myers committee what Kostić had alleged to the System authorities concerning Lemanski's statement in his vita. A system auditor validated Kostić's allegation. Lemanski appropriated the auditor's finding as his own. Lemanski played the straw man game: He overstated Kostić's allegation, falsely accused Kostić of making the overstated allegation, and falsely adopted the auditor's finding and Kostić's allegation as Lemanski's own original statement. Defendants admit that in November 2010, Lemanski criticized Kostić for reporting his military service to the System authorities and that in December 2010, Kostić was dismissed.[125]

Brown testified about multiple conversations among high administrators concerning expulsion of Kostić from campus. Brown met with Jones and Lemanski. Lemanski asked Brown to expel Kostić from campus.  Brown relayed this request to Spinato, who agreed to expel Kostić. Brown referred Spinato to Lemanski for an explanation.[126] Lemanski's shifting testimony about Kostić's expulsion contradicts Jones and Brown's testimony. Jones claims that Kostić was expelled for threatening Evans, although Evans denies she was threatened. Lemanski claims Kostić was expelled because Kostić interacted with students while accused of sexual harassment. Contrary to Brown's testimony, Lemanski denies asking Brown to expel Kostić or

---

[124] Kos. Appx 105-06; 402; 406; 403; 403; 405; 405; 403-04; 403-04, 406-08.
[125] Kos. Appx 406; 406-07; 404, 413; 407; 408; 409; 409; 410; See Dkt. Nos. 40 and 46, ¶ 189.
[126] Kos. Appx 329; 330; 330; 331; 336; 337, 335.

limit Kostić's access to campus. The inference drawn in favor of Kostić is that Lemanski was a decision-maker concerning the expulsion.[127]

The official expulsion order does not show any offense by Kostić or reason for his expulsion. The order provides Kostić with an appeal to Spinato. Kostić kept asking, and Spinato kept refusing, to give the reason for expulsion. Therefore, Kostić was unable to appeal his expulsion. Lemanski guided Spinato.[128]

### e. Evans acted objectively unreasonably in connection with Kostić's protected speech.

Lemanski and Evans jointly suspended Kostić to punish him for his speaking out against establishment of a religion at TAMUC by Jang and Jones and religious favoritism by Jang.[129] It is undisputed that, from March 15, 2010 until May, 2010 Kostić was speaking out, first at TAMUC and later also in the news media, about the chemical fire in Ni's laboratory, unsafe practices, contaminated building, exposure of custodians, suppression of speech, and cover-up. On April 1 and 2, 2010, Evans instructed faculty and students not to talk to the media.[130] Defendants admit that, "[o]n April 4, 2010, Kostić wrote to Evans, Lemanski, and others; claimed public interest; protested censorship and cover-up; invoked freedom of speech, academic freedom and Governor's order about safety; and demanded the gag order be lifted." Defendants also admit that "no one replied to Kostić."[131]

In the spring semester of 2010, Kostić was speaking out about hazardous practices at TAMUC. Evans testified that in that semester, Lemanski and Evans met with a group of fewer

---

[127] Kos. Appx 421-22; 421-22; 422; 111-14.
[128] Kos. Appx 233; 67; 55-57; 68-75; 274.
[129] Dkt. No. 81, §§ 8, 9, 11-15.
[130] Kos. Appx 61.
[131] For admissions, see Dkt. Nos. 40 and 46, ¶ 176; Kos. Appx 62.

than a dozen chemistry students and faculty members. Kostić was talked about, but was neither invited nor informed of the meeting.[132] Negative publicity for the defendants in the aftermath of the fire continued into May, 2010. On June 15, 2010, Evans wrote that evaluating Kostić was "a severe problem for all of us" and that she was "being pressed from above." On June 16 and 24, 2010, Evans twice negatively evaluated Kostić's performance, rating it 3.9 and 4.0. Lemanski testified that marks about 4.0 are very bad at TAMUC.[133]

### 2. Kostić's activity and speech were protected although Kostić was a department head and a member of the faculty.

Defendants dispute facts they admitted in their answer.[134] Many of Defendants' allegations in Dkt. 108 at 11-12 contradict their previous admissions.[135]  Defendants admit the following facts:

> "[Kostić's] job did not require him to speak out on public matters."[136]

> "The defendants have not denied that [Kostić] publicly criticized the university on lab safety issues."[137]

> Kostić stepped down as department head in May, 2007.[138]

> Kostić first met Shi in October, 2008, and began helping Shi in November, 2008.[139]

> Kostić spoke out about proselytization and establishment of a religion from January, 2009 until April, 2009 and in February, 2010.[140]

---

[132] Kos. Appx 341.
[133] Kos. Appx 236; 345; 175-77; 420.
[134] Dkt. No. 46.
[135] Dkt. Nos. 40 and 46, ¶¶ 141, 143-45, 148, 149, 151, 156, 158, 160, 161, 164, 166, 174, 176, 177, 179-82, 186, 188, 189.
[136] Dkt. Nos. 40 and 46, ¶ 194.
[137] Dkt. No. 113 at 10.
[138] Dkt. No. 81, §5b
[139] Dkt. No. 81, §7
[140] Dkt. No. 81, §§ 9, 10(a), 10(b), 11(c).

> Kostić spoke out about unsafe practices, an explosion, a fire, and exposure of custodians to toxic environment from March, 2010 until May, 2010. [141]

> Kostić warned about dangers of bonfire in October, 2010. [142]

Kostić was suspended and stripped of TAMUC duties from February 11, 2010 until his dismissal, in December, 2010. Kostić could not have, and did not, act within the scope of his employment when he was speaking out about unsafe and reckless practices, explosion, fire, abuse of custodians, and cover-up from March until May, 2010. Defendants suspended and ostracized Kostić but could not silence him.

Defendants admit that "[o]n February 26, 2010 around 3 A.M., an explosion and chemical spill occurred in a chemistry laboratory for students." [143] Defendants admit that "[o]n March 15, 2010, soon after the fire, Kostić orally warned Mark Giossi, Jeffrey McMurray, and John Harris, and promptly wrote to these three and Evans, that the custodians had to be protected and that general conditions were unsafe and unhealthy." [144] The recipients ignored Kostić's warnings and denied the custodians the needed protection. [145]

Defendants cannot point to any statement in which Kostić advanced his personal interest or any narrow interest. Quite the opposite: Kostić spoke out as a concerned citizen, about issues of public interest. Defendants ignored his private, tempered warnings. News media approached Kostić about these issues. He cooperated, and newspaper stories, newspaper editorials, and a television newscast followed. This is evidence of public interest in the matters about which Kostić spoke out.

---

[141] Dkt. No. 81, §18.
[142] Dkt. No. 81 at 47-48.
[143] Dkt. Nos. 40 and 46, ¶ 161.
[144] See Dkt. Nos. 40 and 46, ¶ 169.
[145] Kos. Appx 17; 332-33; 337.

### 3. Defendants portray Kostić to the Court as a trouble maker because of his protected speech and opposition to retaliation.

Acting with Shi and by himself, Kostić filed his first Title VII complaints in January, 2009. Until then, there were no complaints about Kostić in the provost's office, and Kostić was no more an issue than the average professor was.[146] Defendants promptly retaliated and continued retaliating for two years until they dismissed Kostić.[147]

Contemporaneous documents show that Kostić was acting oppositely from the way defendants now portray him to the Court. Kostić acted collegially. He objectively evaluated, supported, and helped Jang and Starnes after he knew they were undermining and falsely accusing him.[148] Although a System lawyer, representing TAMUC, "strongly urged" Kostić to file a complaint against Jang, Kostić did not file, hoping that Jang would accept Kostić's offer of peace.[149] After Jang's reprimand and threat of dismissal, Kostić offered a conciliatory compromise, which TAMUC rejected.[150]

Kostić dissuaded Shi from suing TAMUC, recommended that Shi file an internal complaint instead, and advised the Crenshaw committee how to save TAMUC from lawsuit.[151] Defendants admit that Kostić "recused himself from determining Zhang's seminar grade because he had filed complaints about Zhang and her husband, Ni."[152] No Defendants showed such restraint toward Kostić.

---

[146] Dkt. No. 81 at 26
[147] Dkt. No. 81, §§ 7, 8, 11-17, 19, 21.
[148] Kos. Appx 121-27, 156-57,  138, 139, 129, 130, 46, 134-35, 136, 5-6, 137; 239-40.
[149] Dkt. No. 81 at 17.
[150] Kos. Appx 7-8
[151] Kos. Appx 128, 9-12
[152] Dkt. Nos. 40 and 46,  ¶ 268(e).

In his EEOC/TWCCRD charge, Kostić offered to settle. Later, he accepted mediation. Defendants refused both.[153] Nobody accused Kostić at the time of behaving disruptively. Dismissal charges and Defendants' answer to Interrogatory No. 2 are silent on Kostić's purported disruptive behavior. Defendants are inventive.[154]

### 4. Defendants cannot whitewash their mendacity with an in-house termination in appeals process.

Kostić may have received a hearing. Under the procedural veneer, however, Defendants and their agents acted unfairly and dishonestly, and they continued retaliating against Kostić. Defendants  improperly influenced the committees chaired by Jeff Kopachena, Harry Fullwood, and Chris Myers, and then covered up their actions. Specifically, Defendants and their agents guided Myers and his committee with ex parte instructions and evidence. The outcome of the appeal was predetermined.[155]

It is undisputed that each of 15 committee members had two binders, supplied by Kostić and TAMUC, consisting of 364 and 316 pages, respectively. It is also undisputed that after the hearing of November 9, 2010 and before November 23, 2010, the Myers committee gathered in the office of defendant Lemanski and shredded all records of the appeal and hearing, including the committee members' notes. Some of the members shredded documents individually.[156]

---

[153] Kos. Appx 18-21, 306.
[154] Kos. Appx 63-64; 318  Irog 2 answer.
[155] Dkt. No. 81, §§ 20, 21, 24b, 24c, 25.
[156] Dkt. No. 81 at 52.

It is undisputed that defendants learned of Kostić's EEOC/TWCCRD charge and right-to-sue letter, respectively, in February and August, 2010, and that Kostić filed his lawsuit on November 8, 2010. Spoliation of evidence is treated in Kostić's motion to compel production.[157]

### C.    Fact issues exist concerning Jang's official immunity to defamation claim.

Jang prepared a memorandum about Kostić dated April 11, 2007 and sent it to the highest TAMUC officials at the time – president, provost, and Human Resources director. Jang admits making all the defamatory statements in the memorandum. All of these statements are false and were false when Jang made them. The statements are quoted and admitted in the pleadings.[158]

Jang misrepresented the signers of the memorandum of April 11, 2007 as "All Faculty and Staff Chemistry Department." In fact, of the faculty members, only Jang and two others signed. Jang excluded Kostić, and some other faculty members chose not to participate. Nixon was neither a faculty member nor a staff member.[159] Jang testified that he viewed the memorandum of April 11, 2007 as a threat to Kostić and that he had accused Kostić without trying to find out whether Kostić in fact had done as Jang alleged.[160] Jang complained that Crenshaw's doing the same to Jang. ("He is unethical blaming me…without any investigation.")[161] Jang's testimony is evidence of his bad faith and actual malice. Jang testified that had he tried to get Kostić's side of the story before writing the defamatory memorandum of April 11, 2007, things might have turned out differently.[162]

---

[157] Dkt. Nos. 74, 94, 111.
[158] Dkt. Nos. 40 and 46, ¶ 291(d); Kos. Appx 241-45; 348; Dkt. No. 63 at APP 1200-02; Kos. Appx 357; 377-81; 387, 388; 348; 349; 178-82; 381-86 ; 87-88; 99-102; 91-92; 89,  93-94, 96-97; 101-02.
[159] Kos. Appx 348; 120.
[160] Kos. Appx 350; 355; 84-86; 355-57.
[161] Kos. Appx 313-15.
[162] Kos. Appx 358.

*Plaintiff's Response to Defendants' Second (Renewed) Motion for Summary Judgment*          *Page 32*

Jang made the defamatory statements to Nixon, who was no longer associated with TAMUC, at Nixon's home in April 2007. Nixon signed the memorandum.[163] Nixon, Clevenger, Starnes, and Johnson testified under oath that they had signed Jang's memorandum without personally knowing the facts alleged therein.[164]

In answer to Interrogatory No. 18, Defendants state that between June 6, 2006, and December 8, 2010, Jang communicated with 17 persons, inside and outside TAMUC, on the subjects of Kostić's work performance, Kostić's conduct, disciplinary processes against Kostić, or charges against Kostić. This answer is inaccurate. Witnesses state and documents show that Jang communicated on the same subjects also with Laurence Angel, Stephen Dahlem, Amy Davis, Arun Goyal, Allan Headley, Mary Hendrix, Kristine Jang, Saša Korom, Tiffany Lee, Carolyn Marrujo, Frank Miskevich, 15 members of the Myers committee, Bukuo Ni, Gary Peer, Mary Kay Sherman, Michelle Vieira, Alexandra (or Alexandria) Vonausdall (or von Ausdall), and Qianying Zhang.[165] Jang has been withholding relevant communication, objecting to Kostić's requests for production, and resisting Kostić's motion to compel production.[166]

It is undisputed that Kostić submitted his accurate vita to TAMUC and no one, not even Kostić's detractors, alleged otherwise. TAMUC's webmaster, typing in 2006, erred in a single digit – 2006 instead of 2005 – while copying from Kostić's accurate vita. It is undisputed that Kostić had the typographical error corrected as soon as he was informed about the error, in early 2007. Jones used the typo as one of the dismissal charges in June, 2010.[167]

---

[163] Kos. Appx 117-19; 350-51; 51.
[164] Kos. Appx 87-88; 93-96; 98, 100-01, 103; 117-19; 351.
[165] Kos. Appx 324-26  Irog 18.
[166] Dkt. Nos. 74, 88, 94, 107, 111.
[167] Kos. Appx 63-64.

On the one hand, Jang misrepresented, the Fullwood and Myers committees accepted, and Jones used, the webmaster's typo as Kostić's intentional falsehood. On the other hand, Jang accepted Vonausdall's fabricated vita, containing invented degrees and invented theses with invented, meaningless titles, all from nonexistent universities. Jang assigned teaching duties to Vonausdall even though she lacks any credentials in chemistry and does not know basic chemistry.

Jang did not inform Kostić of the denunciation in the memorandum of April 11, 2007, and he concealed the memorandum from Kostić. Kostić testified he became aware of the memorandum and its authorship for the first time in September 2010. Mailing documents confirm this date. Further evidence comes from Kostić's contemporaneous writings on subjects to which the libelous memorandum was highly relevant. Kostić did not mention the libelous memorandum in these writings. Defendants saved the libelous memorandum for three and a half years, and used it for dismissing Kostić.[168]

## 1.  Jang did not act with discretion and good faith in the course of state employment.

Defendants argue that "[a]n act is discretionary if it involves personal deliberation, decision making, and judgment."[169] Jang testified that on April 11, 2007, he signed libel by others concerning events and acts that Jang had not attended or observed himself. Evidently, Jang did not deliberate, and he suspended judgment. He was not objectively reasonable.[170]

---

[168] Kos. Appx 351; 387-88; 65;66;121-26; 183-84; 134-35; 79-81.
[169] Dkt. No. 62 at 46 (Defendant's pagination) or at 59 (ECF pagination); Dkt. No. 62 at 46 (Defendant's pagination) or 59 (ECF pagination)
[170] Kos. Appx 355; 84-86; 355-57.

Jang created some libelous statements and adopted others. He testified that Kostić could have felt threatened and that he never asked for Kostić's side of the story. In his deposition, Jang regretted not having asked Kostić.[171]

In April, 2007, Kostić was department head and Jang's supervisor. Kostić did not instruct or encourage Jang to libel Kostić; neither did James Klein, Kostić's first and Jang's second supervisor at the time, to whom Jang libeled Kostić. If Jang had been acting in good faith and without malice, he would not have participated in concealing the April 11, 2007 memo from Kostić.

Defendants' concluding argument[172] again relies on the Myers committee. This committee, however, considered only the dismissal charges, those in Jones's dismissal notice of June 17, 2010. Jones used only several of Jang's many libelous statements in the memorandum of April 11, 2007. Kostić excluded those statements from his defamation claim and based this claim on Jang's remaining statements in the memorandum.[173] The Myers committee report is silent on those statements in the memorandum of April 11, 2007 that constitute the defamation claim.

## II.    RENEWED CLAIMS PREVIOUSLY CONSIDERED

### A. Retaliation  claims.

Because many of Kostić's acts are protected by both Title VII and the First Amendment, Kostić uses some, but not nearly all, of the facts in both retaliation claims. The two claims overlap partly, not completely. Between November, 2008, when retaliation started, and

---

[171] Kos. Appx 350; 358.
[172] Dkt. No. 62 at 61.
[173] Dkt. No. 40, ¶ 291(h).

December, 2010, when Kostić was dismissed, the defendants committed more than 50 distinct materially adverse actions against Kostić.[174] The causal nexus extends over the whole period of more than two years. Kostić's evidentiary record for the first motion for summary judgment was incomplete. For this second motion, Kostić expands the record with evidence for ostracism, threats, criticism, four police actions in addition to the five already in the record, continued harassment after dismissal and during this litigation, frivolous lawsuit, and more.

Kostić gave evidence, most of it from Defendants' own documents and witnesses, that the Myers committee was neither impartial nor independent.[175] In this response, Kostić adds new evidence that McKinney was a rubber stamp and that he acted objectively unreasonably. See Section I(B)(1)(b) above.

There was no dispute about Kostić's speech. Almost all of it is in writing, including a newspaper story. Some of it was in a television newscast, a recording of which defendants are withholding. Defendants did not conduct a reasonable fact-finding inquiry and could not reasonably believe the false accusations. The inquiry was dishonest.[176] For example, Lemanski and Jones suppressed Lee's repeated denial of any sexual harassment, and they persecuted Kostić on Starnes's allegation on Lee's behalf. For Vonausdall's fabricated petition, Vieira's failed solicitation of complaints against Kostić, and suppression of the solicitation, see above. Defendants had plenty of reasons to suspect that the accusations were false. Kostić presented evidence of dishonesty on the part of defendants and their agents. Kostić presented witnesses and documents in his own support throughout TAMUC's investigation.

---

[174] Dkt. Nos. 81 (most pages) and 82.
[175] Dkt. No. 81, §§ 20, 21, 24, 25a.
[176] Dkt. No. 81, §§ 12, 14-17, 20, 21, 24, 25a.

**1.  Kostić presents evidence that Jones acted with retaliatory animus.**

Kostić incorporates Section I(B)(1)(c) above and the reprimand with Crenshaw on February 6, 2009.[177] Jones ignored Kostić's complaints against retaliation. In tandem with Peer, Jones deceived Kostić in May 2009 that his complaints were being investigated.[178] In deposition, Jones denied that he had appointed and replaced some of the members of the Myers committee. A contemporaneous roster of the committee members contradicts Jones: six names are crossed out, and three members differ in the roster and in the Myers committee's report. Joyce Scott wrongly states her membership in her affidavit. Timing suggests Scott may have been one of Jones's appointees. Dale Funderburk in his affidavit contradicts Jones speaking about a replacement member who "was asked" to serve. A reasonable person can infer that Jones changed the committee and asked that member, and possibly other members as well, to serve.[179] Dkt. Nos.  81 and 82 are so full of evidence of retaliation and causation that specifying page numbers in Dkt. No. 81 is unnecessary. Further evidence is given in Section I(B)(1)(c) above. Defendants attribute to Kostić ("own account") the exact opposite of his many written statements. Moreover, defendants' allegations to the Court contradict their previous admissions.[180]

Kostić repeatedly wrote to the defendants against establishment of a religion, proselytization, and religious favoritism at TAMUC. Voluminous documents are in the summary-judgment record.[181] Kostić confronted the defendants with these documents in

---

[177] Dkt. No. 81, § 8d
[178] Dkt. No. 61 at 30; Dkt. No. 81, §11 preamble, 11a, 11c.
[179] Kos. Appx 369; 434; 63-64; Dkt. No. 63 at APP 1208-09; Dkt. No. 63 at APP 1196-97.
[180] Dkts. Nos. 40 and 46, ¶¶  45, 46, 65, 66, 69, 75, 79, 82, 102, 144, 145, 149, 151, 156, and 157.
[181] Dkt. No. 81, ¶¶ 7-9, 11c.

*Plaintiff's Response to Defendants' Second (Renewed) Motion for Summary Judgment*          *Page 37*

depositions, and transcripts are replete with defendants' statements about these documents. Defendants now ask Kostić to present "at least some evidence" that they were aware of the subjects about which they testified at length.

The Magistrate Judge accepted Kostić's protected *oral* statements, writing, "It is also *undisputed* that Plaintiff spoke out against what he considered prohibited religious activities, such as *closing the university in observance of Good Friday and conducting a Celebration of Faith that included prayer*…" (emphasis added).[182] Defendants impute to Kostić allegations ("to family") he did not make and does not claim he made. Kostić did not mention his family members in connection with religion at TAMUC. Kostić and his family members are believers, but they have kept their faith apart from their public jobs.

Termination is not the only adverse action that matters under Section 1983.[183] Kostić is not limited to ultimate tangible adverse actions. Instead, the final actions may be material adverse actions separate from termination with final decision-makers for each adverse action. Each individual defendant adversely acted against Kostić, and each made his or her final decision to act so.[184]

Lemanski, Evans, and Jang were not Kostić's co-workers but, respectively, his third, second, and first supervisors. Each of them adversely acted against Kostić and exerted influence upward in the decision chain ending with Jones and McKinney for additional adverse actions. McKinney, Jones, Lemanski, and Evans each relied on recommendations by defendants below in the decision chain, ending with Jang, who were improperly motivated.

---

[182] Dkt. No. 100 at 6.
[183] *See Burlington Northern v. White*, 548 U.S. 53 (2006).
[184] Dkt. No. 81.

*Plaintiff's Response to Defendants' Second (Renewed) Motion for Summary Judgment*                    *Page 38*

The following are a few out of many examples of improperly motivated influence and reliance on improperly motivated influence:

> Jang and Jones, "cooperat[ed] to catch the bigger fish" while Jang was "under 'investigation'" on Kostić and Shi's charges. After this sham investigation – Jang put the word in quotation marks – Jones and Peer did not discipline Jang but rewarded him.[185]

> Evans recommended to Lemanski that Kostić be dismissed, and the two defendants jointly suspended Kostić.[186]

> Evans relied on Jang in giving Kostić poor performance evaluations in June, 2010.[187]

> Lemanski recommended to Jones that Kostić be terminated.[188]

Defendants continue to argue as though termination was the only adverse and retaliatory action that mattered. Jang, Evans, and Lemanski materially adversely acted against Kostić before Jones issued the termination notice. Lemanski acted both before and after the notice, and continued acting against Kostić after the firing, during this litigation. Moreover, Lemanski, represented by his son, frivolously sued Kostić during this litigation, harassed Kostić with 609 requests for admission, and non-suited his action after pressuring Kostić through state court for one and a half years. Kostić's assertion that Lemanski improperly influenced the Crenshaw Committee findings rests on documents and deposition testimony. Kostić's analysis is rooted in evidence, and is not "strained."[189]

---

[185] Dkt. No. 81 at 22, 24.
[186] Dkt. No. 81 at 32, 34.
[187] Kos. Appx 236.
[188] Kos. Appx 104.
[189] Dkt. No. 81, § 17.

**B.      Defamation claim against Jang.**

Kostić incorporates Section I(C) above. Even without the withheld evidence, Kostić has enough for summary judgment.[190] Nevertheless, Kostić should be entitled to the emails to adequately respond to the motion for summary judgment. Defendants are withholding emails and other documents concerning Jang's communications mentioning Kostić. Two weeks after deposition in Kostić's case, Jones announced complete destruction of two decades worth of emails. Defendants are resisting Kostić's motion to compel production of evidence.[191] At the same time, defendants are arguing that Kostić lacks evidence, and trying to get Kostić's defamation claim dismissed.

Jang testified he had called Iowa State University about Kostić, as Kostić claims.[192] Jang testified he had published the statements. Defendants [Jang] admitted that Jang [he] published, and in this motion they [he] contradict[s] themselves [himself] to the Court.[193]

Jang testified that he took the lead in preparing and publishing the memorandum of April 11, 2007 without knowing or checking the truth of libelous statements concerning Kostić, and did not tell Kostić about the memorandum. Jang was Kostić's subordinate at TAMUC at the time. Jang's actions in the course of his employment had to be disclosed to his supervisor. Any action concealed from the supervisor is therefore taken outside the course of employment. Jang's change of status after preparing and publishing the memorandum is irrelevant.[194]

---

[190] Dkt. No. 111 at 3-6, 9, 14.
[191] Dkt. No. 112 at Pl. Appx-30 (22:0 to 22:30).
[192] Kos. Appx 354; 354; 354; 374-76; 156-57.
[193] Dkt. Nos.40 and 46, ¶¶ 26 and 291(d); Kos. Appx 178-82.
[194] Kos. Appx 348; Dkt. No. 63 at APP 1200-02; Kos. Appx 357; 349; 355; 84-86; 355-57; 351.

The District Judge directed Jang to argue his official immunity. Jang now argues state common law qualified privilege as well.[195] The privilege is an affirmative defense.[196] The privilege is waived because it has not been included in an answer.

Under Rule 56(d), FED. R. CIV. P., a motion for summary judgment may be denied because facts are unavailable.  Kostić has requested the emails sent by Jang.[197] Jang cannot deny the defamatory statements, withhold the written communication, and then move for summary judgment. Kostić previously stated that a motion for summary judgment could be denied on all issues without the motion to compel. This remains true because a reasonable inference can be drawn concerning the defamation; however, to the extent the actual communication is necessary, it should be produced before summary judgment is granted.

Kostić controverted testimony of all defendants and all their agents.[198]

WHEREFORE, the motion for summary judgment should be denied.

Respectfully submitted,

**SANFORD BETHUNE**

By: */s/  Brian P. Sanford*
Brian P. Sanford
Texas Bar No. 17630700
David B. Norris
Texas Bar No. 24060934

---

[195] Dkt. No. 106.
[196] *French v. French*, 385 S.W. 61, 73 (Tex. App.–Waco 2012, pet. denied).
[197] Item 6 in the motion to compel relates to Request for Production 19 requesting emails from Jang. Dkt. No. 74. The Joint Status Report refers to the item as Request for Production 6; it should be request item 6. Dkt. No. 111.
[198] Dkt. No. 81.

3610 Shire Blvd., Suite 206
Richardson, Texas 75082
Telephone: (972) 422-9777
Facsimile:  (972) 422-9733

**ATTORNEYS FOR PLAINTIFF
NENAD KOSTIĆ**

## CERTIFICATE OF SERVICE

On May 13, 2013, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Brian P. Sanford*

## VERIFICATION

I hereby declare under penalties of perjury that I have personal knowledge of the procedural facts and the reasons stated in this response in Section II(B) regarding defamation by Defendant Ben W.-L. Jang, that Plaintiff Nenad Kostić cannot present essential facts to justify his opposition to the motion for summary judgment and that the procedural facts and the reasons stated in this response are true and correct.

*/s/  Brian P. Sanford*